[No. C047857. Third Dist. Dec. 5, 2006.]

WILLIAM CALVERT et al., Plaintiffs and Appellants, v.
COUNTY OF YUBA et al., Defendants and Respondents;
WESTERN AGGREGATES LLC, Real Party in Interest and Appellant.

## COUNSEL

Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Christian L. Raisner, Theodore Franklin and M. Suzanne Murphy for Plaintiffs and Appellants.

Jeffer, Mangels, Butler & Marmaro, Kerry Shapiro, Paul L. Warner and Melanie L. Tang for Real Party in Interest and Appellant.

No appearance for Defendant and Respondent County of Yuba.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General and Russell B. Hildreth, Deputy Attorney General, for Defendants and Respondents Department of Conservation and State Mining and Geology Board.

## OPINION

**DAVIS, J.**—This appeal involves the Surface Mining and Reclamation Act of 1975. (SMARA; Pub. Resources Code, § 2710 et seq.) Our principal conclusion is that if an entity claims a vested right pursuant to SMARA to conduct a surface mining operation that is subject to the diminishing asset doctrine, that claim must be determined in a public adjudicatory hearing that meets procedural due process requirements of reasonable notice and an opportunity to be heard. We give this conclusion limited retroactive effect. We shall affirm the judgment with certain modifications.

### BACKGROUND

The Legislature enacted SMARA in 1975 "to create and maintain an effective and comprehensive surface mining and reclamation policy." (Pub. Resources Code, § 2712.)[1] Through SMARA, the Legislature intended to: prevent or minimize adverse environmental effects and reclaim mined lands; encourage the production and conservation of minerals while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment; and eliminate residual hazards to the public health and safety. (§ 2712, subds. (a)–(c).)

At the heart of SMARA is the general requirement that every surface mining operation have a permit, a reclamation plan, and financial assurances to implement the planned reclamation. (§ 2770, subd. (a); *People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 984 [32 Cal.Rptr.3d 109, 116 P.3d 567] (*El Dorado*).)

Under section 2776 of SMARA, though, "[n]o person who has obtained a vested right to conduct surface mining operations prior to January 1, 1976, shall be required to secure a permit pursuant to [SMARA] as long as the vested right continues and as long as no substantial changes are made in the operation . . . . A person shall be deemed to have vested rights if, prior to January 1, 1976, he or she has, in good faith and in reliance upon a permit or other authorization, if the permit or other authorization was required, diligently commenced surface mining operations and incurred substantial liabilities for work and materials necessary therefor." Notwithstanding a vested right to conduct surface mining operations, the two other basic requirements of SMARA—a reclamation plan and financial assurances—apply to operations conducted after January 1, 1976. (§§ 2776, 2770, subds. (b), (c).)

---

[1] Hereafter, undesignated section references are to the Public Resources Code.

Recognizing the diverse conditions throughout the state, SMARA provides for "home rule." This means the local lead agency, usually a city or county, has primary responsibility to implement the provisions of SMARA. (§ 2728; *El Dorado, supra*, 36 Cal.4th at p. 984.) The State Mining and Geology Board (the Board), which is part of the Department of Conservation within the Resources Agency, may step into the shoes and assume the role of the local lead agency if the Board finds that the local agency has not been fulfilling its duties under SMARA. (§§ 601, 660, 2774.4.)

The action before us arises from the determination of Yuba County (County) in May 2000 that Western Aggregates LLC (Western) has a vested right to mine "aggregate" (sand, gravel and rock for construction) from approximately 3,430 acres in the Yuba Goldfields. The Yuba Goldfields consists of approximately 10,000 acres bordering the Yuba River; it once had been mined for gold and now contains massive aggregate deposits resulting from the placer/hydraulic mining of gold dating to the 19th century.

County determined Western's vested rights after the superior court in a previous lawsuit (the *Gilt Edge* lawsuit) had concluded in 1999 that County's zoning authorization for surface mining in the Yuba Goldfields was not a proper substitute for a SMARA permit. After this lawsuit, County invited all mine operators, including Western, to apply for a vested rights determination pursuant to SMARA.

In February 2000, Western filed with County its vested rights submittal, consisting of a six-page cover letter, a 70-page memorandum of law and fact, and nearly 370 exhibits. In May 2000, County sent Western a determination letter. The letter stated that the community development director had found, based on Western's vested rights submittal and materials in County's files, that Western has a vested right to mine aggregate in the 3,430 acres of the Yuba Goldfields. This determination was made without notice to adjacent landowners or to the public, and without a hearing. (Western does not presently mine the total 3,430 acres, but is mining in roughly one-third of this area, apparently intending to move into unmined areas as mined areas are depleted of aggregate. Western also has its sights on about 5,000 additional acres in the Yuba Goldfields.)

Challenging the County's vested rights determination as to Western (and other mining operators), William Calvert and the Yuba Goldfields Access Coalition (collectively, Petitioners) sued the County, the state (including the Board and the Director of the Department of Conservation; collectively, the State) and Western (real party in interest). Calvert has lived on his ranch in the Yuba Goldfields since 1974 and owns property 300 feet from Western's property. The Yuba Goldfields Access Coalition is a nonprofit organization

that includes Yuba County residents and taxpayers. The coalition seeks to open the Yuba Goldfields for public recreational use and establish environmentally sound uses of the Goldfields' natural resources and the Yuba River.

The operative pleading is the Petitioners' third amended complaint and petition for writ of mandate, which the trial court reorganized and clarified. All parties on appeal have accepted this reorganized and clarified pleading, and have used it as the centerpiece of their appeals. We will do likewise.

Petitioners' complaint and petition, as it pertains to Western, contains the following five reorganized causes of action: first—a claim against the County and the State to take enforcement action against Western for allegedly violating SMARA by operating without a permit or a valid reclamation plan, seeking as a remedy an injunction or a writ of mandate; second and third—direct actions against Western for violating SMARA by, respectively, not having a permit or vested rights and not having a valid reclamation plan, and seeking an injunction; fourth—a claim against the State that it abused its discretion by not enforcing SMARA and not taking over the functions of the County as the lead agency, and seeking a writ of mandate; and fifth—a claim that County violated due process requirements of notice and hearing in determining that Western has vested rights to mine the 3,430 acres, and seeking a writ of mandate to remand the matter for proper proceedings.

Western moved for summary adjudication or summary judgment, and Petitioners moved for summary adjudication. (Code Civ. Proc., § 437c.) The trial court granted Western summary adjudication on the first through fourth causes of action, and granted Petitioners summary adjudication on the fifth. Given the ruling on the fifth cause of action, the trial court denied Western's motion for summary judgment as Western's motion did not dispose of all five causes of action. The cross-motions for summary adjudication did account for all five causes of action, though, and the trial court entered a judgment on this summary adjudication.

Western and Petitioners, in an appeal and a cross-appeal respectively, have appealed their losses here. The only mining operation involved in these appeals is Western's.

DISCUSSION

1. *Fifth Cause of Action—Vested Rights Determination and Procedural Due Process*

We start with the fifth cause of action because it sets the stage for discussing the others.

On the fifth cause of action, as noted, Petitioners moved successfully for summary adjudication, the trial court finding that the County had violated procedural due process requirements of reasonable notice and hearing in determining that Western has vested rights to mine the 3,430 acres at issue in the Yuba Goldfields. (The parties have continued to use this 3,430-acre figure, although it may be overstated by 120 acres. We will use it as well, and express no view regarding the 120-acre issue.)

In its original summary adjudication order regarding this cause of action, the trial court issued a writ of mandate that vacated County's vested rights determination as to Western and remanded for further proceedings in compliance with procedural due process. Western then moved for clarification, noting that this order did not specify whether the County or the Board would conduct the remanded proceedings. In a modification to the order (carried into the judgment), the trial court remanded to the County for further proceedings, subject to the following three conditions: County was not required to hold a new vested rights proceeding; Western was not required to request one; and if County did hold such a proceeding, it had to satisfy procedural due process requirements of reasonable notice and opportunity to be heard. (The trial court's modified order had also noted that other administrative bodies were not foreclosed from determining Western's vested rights if legally authorized or required to do so.)

Western appeals from that portion of the judgment on the fifth cause of action that states that Western's vested rights must be determined pursuant to procedural due process requirements of reasonable notice and opportunity to be heard. Petitioners cross-appeal from the modified portion of this judgment setting forth the three remand-related conditions.

Before we tackle the merits of these claims, we must address several threshold issues tendered by Western.

First, Western claims we lack jurisdiction because Petitioners did not pray in their complaint for a remand for a public hearing on Western's vested rights determination, and did not specify in their notice of appeal that they were appealing the modified portions of the judgment as to the fifth cause of action. As Western acknowledges, however, Petitioners, in the operative complaint and petition, allege that County's vested rights determination was improperly made " 'without public notice' " and " 'without affording the public an opportunity to comment.' " A remand for a proper procedure that meets these requirements goes without saying. As for their notice of cross-appeal, Petitioners stated in part that they were appealing the portion of the judgment "incorporating the *Modified Orders* Granting Summary Adjudication [i.e., the remand-related three conditions regarding the fifth cause of action]." (Italics added.)

Next, Western asserts that Petitioners have abandoned their arguments regarding reclamation plan deficiencies. Not so. Those deficiencies have been a part of Petitioners' case since they filed their complaint and petition. In their brief on appeal, Petitioners define the nature of their action in the following terms: "This action seeks enforcement of SMARA as to a broad expanse of the Yuba Goldfields—in particular, the requirement that all surface mining operations be conducted pursuant to permit and that the permit be conditioned upon a valid reclamation plan . . . approved by the lead agency."

As for its final complement of threshold contentions, Western argues that Petitioners are foreclosed from claiming procedural due process requirements as to the vested rights determination by the principles of judicial estoppel, statute of limitations and failure to exhaust administrative remedies. We take these in turn.

■ The principle of judicial estoppel forecloses a litigant from taking inconsistent positions that suit its purposes at different points in the litigation and that impinge on the integrity of the judicial process. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96].) The problem for Western on this point is that the examples it cites of Petitioners' purported inconsistencies regarding their due process position show that Petitioners have *consistently* maintained this position *against Western*. For example, Petitioners moved to sever the issue of procedural due process with respect to vested rights from other issues, and Western opposed this motion on nonsubstantive grounds. Petitioners opposed Western's motion to join two other mining operators as indispensable parties, arguing that these two operators had entirely different mining operations from Western's. And Petitioners settled with operators other than Western even though vested rights of these operators had not been established in due process hearings.

As for the statute of limitations, Western contends that Petitioners failed to meet the short statute of limitations under the California Environmental Quality Act. (CEQA; § 21000 et seq.) County filed a notice that its vested rights determination as to Western—a ministerial determination, County maintained—was exempt from CEQA. However, Petitioners do not challenge the vested rights determination on CEQA grounds; therefore, the CEQA statute of limitations does not apply. In any event, as we shall see later, the vested rights determination here is not a ministerial determination under CEQA.

■ And, finally, there is a fundamental problem with Western's claim of Petitioners' failure to exhaust administrative remedies: The essence of Petitioners' fifth cause of action is that the administrative procedure the County used to determine Western's vested rights is constitutionally inadequate. As

the state Supreme Court remarked in rejecting a similar claim, "[o]ne need not exhaust inadequate remedies in order to challenge their sufficiency." (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 611 [156 Cal.Rptr. 718, 596 P.2d 1134] (*Horn*).)

That brings us to the substance of Western's appeal involving the fifth cause of action: Is the vested rights determination regarding Western's surface mining operation as to the 3,430 acres subject to procedural due process requirements of reasonable notice and opportunity to be heard? Our answer: Yes.

To begin our analysis, we set forth some basic principles of how procedural due process applies generally to land use decisions.

There are three general types of actions that local government agencies take in land use matters: legislative, adjudicative and ministerial. (2 Longtin's Cal. Land Use (2d ed. 1987) § 11.10, p. 989 (Longtin); see also *Horn, supra*, 24 Cal.3d at pp. 612, 615–616.) Legislative actions involve the enactment of general laws, standards or policies, such as general plans or zoning ordinances. (Longtin, *supra*, at pp. 989–990.) Adjudicative actions—sometimes called quasi-judicial, quasi-adjudicative or administrative actions—involve discretionary decisions in which legislative laws are applied to specific development projects; examples include approvals for zoning permits and tentative subdivision maps. (Longtin, *supra,* at p. 990.) Ministerial actions involve nondiscretionary decisions based only on fixed and objective standards, not subjective judgment; an example is the issuance of a typical, small-scale building permit. (*Ibid.*; see *Horn, supra*, 24 Cal.3d at p. 616; see also *Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 271–272 [235 Cal.Rptr. 788] (*Friends of Westwood*); *People v. Department of Housing & Community Dev.* (*Ramey*) (1975) 45 Cal.App.3d 185, 193–194 [119 Cal.Rptr. 266] (*Ramey*).)

■ The state and federal Constitutions prohibit the government from depriving persons of property without due process. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 7, subd. (a).) In line with this constitutional bedrock, an adjudicative governmental action that implicates a significant or substantial property deprivation generally requires the procedural due process standards of reasonable notice and opportunity to be heard. (*Horn, supra*, 24 Cal.3d at pp. 612–616.) Legislative action generally is not governed by these procedural due process requirements because it is not practical that everyone should have a direct voice in legislative decisions; elections provide the check there. (*Id.* at p. 613; see Longtin, *supra*, § 11.10, p. 990.) Ministerial action is generally not within this constitutional realm either. This is because

ministerial decisions are essentially automatic based on whether certain fixed standards and objective measurements have been met. (*Horn, supra,* 24 Cal.3d at pp. 615–616.)

There is one more legal principle that plays a pivotal role in our analysis: the principle of vested rights. In light of the state and federal constitutional takings clauses, when zoning ordinances or similar land use regulations are enacted, they customarily exempt existing land uses (or amortize them over time) to avoid questions as to the constitutionality of their application to those uses. (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 551–552 [48 Cal.Rptr.2d 778, 907 P.2d 1324] (*Hansen*).) Such exempted uses are known as nonconforming uses and provide the basis for vested rights as to such uses. (*Ibid.*)

■ Generally, for a nonconforming land use to be allowed to continue, the use must be similar to the use existing at the time the land use law became effective. Intensification or expansion of the use is prohibited. (*Hansen, supra,* 12 Cal.4th at p. 552.) This general principle, however, does not apply neatly to surface mining operations. This is because, unlike other nonconforming uses in which the land is merely incidental to the activities conducted upon it, surface mining contemplates the excavation and sale of the land itself, and the excavated land is a " 'diminishing asset' " that requires expanding the mining into nonexcavated areas to continue the land use. (*Id.* at pp. 553–556.) In this situation, California follows the "diminishing asset" doctrine. Under that doctrine, a vested right to surface mine into an expanded area requires the mining owner to show (1) part of the same area was being surface mined when the land use law became effective, and (2) the area the owner desires to surface mine was clearly intended to be mined when the land use law became effective, as measured by objective manifestations and not by subjective intent. (*Id.* at pp. 555–556; see *id.* at p. 576 (conc. opn. of Werdegar, J.).)

With these principles in mind, Western contends that its vested rights determination is ministerial. Petitioners counter that this determination is adjudicative and requires the procedural due process protections of reasonable notice and an opportunity to be heard for persons significantly affected by the determination. We agree with Petitioners.

We start with the SMARA statute on vested rights. Section 2776 states as pertinent: "No person who has obtained a vested right to conduct surface mining operations prior to January 1, 1976, shall be required to secure a permit pursuant to [SMARA] as long as the *vested right continues* and as long as *no substantial changes* are made in the operation except in accordance with [SMARA]. A person shall be deemed to have vested rights if,

prior to January 1, 1976, he or she has, in *good faith* and in reliance upon a permit or other authorization, if the permit or other authorization was required, *diligently commenced* surface mining *operations* and *incurred substantial liabilities* for work and materials *necessary therefor*." (Italics added.)

These italicized portions of section 2776 encompass several factual issues that must be resolved through the adjudicative exercise of judgment rather than the ministerial (automatic, nondiscretionary) application of fixed standards and objective measurements.

A good example of this dichotomy is provided by a decision from this court, *Ramey*. (*Ramey, supra*, 45 Cal.App.3d 185.) In *Ramey*, we concluded that the approval of a mobilehome park construction permit was a discretionary act subject to CEQA rather than a ministerial act exempt from CEQA. (A ministerial decision under CEQA similarly involves only the use of fixed standards or objective measurements.) Although the approval process in *Ramey* involved a large number of "ministerial" decisions applying "fixed" design and construction specifications, there were other approval decisions where the standards were "relatively general": for example, " 'sufficient' " supply of lighting; "satisfactory" sewage disposal; "adequate" water supply; and " 'well-drained' " site. (*Ramey, supra*, 45 Cal.App.3d at p. 193; see also *Friends of Westwood, supra*, 191 Cal.App.3d at pp. 270–271.) These relatively general approval decisions did not have the agency, in ministerial fashion, " 'merely appl[ying] the law to the facts . . . us[ing] no special discretion or judgment in reaching a decision.' " (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) Instead, these general approval decisions involved "relatively personal decisions addressed to the sound judgment and enlightened choice of the [agency]. . . . Inevitably they evoke[d] a strong admixture of discretion." (*Ramey, supra*, 45 Cal.App.3d at p. 193; see *Friends of Westwood, supra*, 191 Cal.App.3d at p. 272.)

The same can be said, and has been said, for section 2776's issues of "substantial changes . . . in the operation," and "in good faith . . . diligently commenced . . . operations and incurred substantial liabilities for work and materials necessary therefor." In construing section 2776 in a 1976 opinion, the Attorney General concluded that determining "substantial change[s]" in operations and " 'substantial liabilities' " for work and materials constitute questions of fact which can only be determined on a case-by-case basis in a proper vested rights proceeding before the lead agency. (59 Ops.Cal.Atty.Gen. 641, 643, 655–656 (1976); see also *Horn, supra*, 24 Cal.3d at p. 614 [subdivision development approvals involve the application of general standards to specific parcels of real property; such governmental conduct, affecting the relatively few, is " 'determined by facts peculiar to the individual case' and is 'adjudicatory' in nature"].)

Furthermore, the vested rights determination here encompasses more than just these factual issues set forth in section 2776. Western's extractive surface mining operation implicates the diminishing asset doctrine. Consequently, Western must show that the area it desires to excavate was " 'clearly intended' " to be excavated—as measured by objective manifestations, not subjective intent—when the vested rights trigger of a new law was pulled. (Western concedes this triggering occurred when County's first mining regulation—a mining permit ordinance—became effective in April 1971.) (*Hansen, supra*, 12 Cal.4th at p. 556, italics omitted; see *id.* at p. 576 (conc. opn. of Werdegar, J.).) Moreover, there are issues here regarding whether the alleged vested right has been "continu[ous]" (§ 2776), as the subject site has involved gold mining and not simply aggregate mining.

The sheer quantity and complexity of these factual issues illustrate why the government agency in *Hansen* held a public adjudicatory hearing—with testimony from nearby landowners—and made a findings-based determination regarding a diminishing asset claim of vested rights to mine aggregate on a 67-acre parcel of riverbed and adjacent land. (See *Hansen, supra*, 12 Cal.4th at pp. 540–544, 545–546, fn. 9, 568.) Bear in mind, we are dealing here with a diminishing asset claim of vested rights to mine aggregate on *3,430 acres* of river-related land, which is *more than five square miles* and *more than 50 times the size* of the area at issue in *Hansen*.

*Ramey* noted, importantly, that "[s]tatutory policy, not semantics, forms the standard for segregating discretionary from ministerial functions." (*Ramey, supra*, 45 Cal.App.3d at p. 194.) SMARA's policy is to assure that adverse environmental effects are prevented or minimized; that mined lands are reclaimed to a usable condition; that the production and conservation of minerals are encouraged while giving consideration to recreational, ecological and aesthetic values; and that residual hazards to the public health and safety are eliminated. (§ 2712.) A public adjudicatory hearing that examines all the evidence regarding a claim of vested rights to surface mine in the diminishing asset context will promote these goals much more than will a mining owner's one-sided presentation that takes place behind an agency's closed doors.

A vested rights determination acts as the fulcrum in SMARA policy because it (or its analogue, a permit to surface mine) governs the coverage of the reclamation plan and, in turn, the financial assurances to implement the plan. (§§ 2770, subds. (a)–(c), 2772, subd. (c)(5), (6); see *El Dorado, supra*, 36 Cal.4th at p. 984 [permit, plan and assurances are the heart of SMARA].) A vested rights determination functions in the SMARA scheme as does a surface mining permit—it sets the tone for all that follows. Western concedes the law is settled that the issuance of such permits "is adjudicatory in nature and therefore subject to notice and hearing requirements." (*Hayssen v. Board*

*of Zoning Adjustments* (1985) 171 Cal.App.3d 400, 404 [217 Cal.Rptr. 464] (*Hayssen*).) A similarity in function between permits and vested rights argues for a similarity in their issuance. Western asserts, though, that vested rights are to be distinguished from conditional permits such as surface mining permits. That is true. Vested rights, if established and continued, generally cannot be conditioned (although they can be limited in time—for example, through amortization of investment). (See *Hansen, supra,* 12 Cal.4th at p. 552.) This recognition, however, does not foreclose vested rights from being established in a basic procedure similar to that for such permits.

We conclude, then, that the determination of Western's vested rights claim to surface mine in the diminishing asset context presents an adjudicative rather than a ministerial determination.

The question remains whether this adjudicative determination implicates significant or substantial deprivations of property to trigger procedural due process protections. (*Horn, supra,* 24 Cal.3d at pp. 612, 616; *Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 548–549 [99 Cal.Rptr. 745, 492 P.2d 1137] (*Scott*); *Hayssen, supra,* 171 Cal.App.3d at p. 404.) We conclude it does.

■ In *Horn* and *Scott*, our state Supreme Court emphasized that adjudicatory land use decisions—in those cases, approvals for significant development projects—which " 'substantially affect' " the property rights of adjacent landowners may constitute property " 'deprivation[s]' " within the context of procedural due process, requiring reasonable notice and an opportunity to be heard for those landowners before the land use decision is made. (*Horn, supra,* 24 Cal.3d at pp. 615–616; *Scott, supra,* 6 Cal.3d at pp. 548–549.) Due process "notice and hearing requirements are triggered only by governmental action which results in 'significant' or 'substantial' deprivations of property, not by agency decisions having only a de minimis effect on land." (*Horn, supra,* at p. 616.) "It is . . . now settled law that the property interests of adjacent landowners are at stake in [such an adjudicatory] land use proceeding, and that procedural due process protections are therefore invoked." (*Hayssen, supra,* 171 Cal.App.3d at p. 404, citing *Scott, supra,* 6 Cal.3d at p. 549.)

Here, Western's vested rights claim involves mining aggregate on over 3,400 acres. Western presently mines on about 1,200 acres, so Western is claiming almost a threefold increase pursuant to vested rights. The mining at issue is extractive surface mining with an expansive appetite. This description itself is enough to envision significant environmental consequences and adverse effects to adjacent properties. As such, property owners adjacent to the proposed mining have significant property interests at stake. (*Horn, supra,* 24 Cal.3d at p. 616; *Aries Dev. Co. v. California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534, 541 [122 Cal.Rptr. 315] (*Aries*).)

Petitioner Calvert presents a typical example of the property deprivations at play for adjacent landowners. In the complaint and petition, Calvert, who owns a house and ranch land within 300 feet of Western's property, alleged that Western's mining operation exposed his property to dust, noise, and air, water and toxic pollution; furthermore, Western's operation has damaged at-risk species of chinook salmon and steelhead trout and made area roadways more dangerous. Calvert has adequately described a property deprivation "substantial" enough to require procedural due process protection. (See *Horn, supra*, 24 Cal.3d at p. 615 [plaintiff there alleged sufficiently that the proposed development project would interfere with his property access and increase traffic congestion and air pollution].) Consequently, Calvert and the other property owners adjacent to Western's vested rights-claimed mining operation are entitled to reasonable notice and an opportunity to be heard in an evidentiary public adjudicatory hearing before that vested rights claim is determined. (*Horn, supra*, 24 Cal.3d at pp. 612, 616; *Scott, supra*, 6 Cal.3d at pp. 548–549; *Hayssen, supra*, 171 Cal.App.3d at p. 404; *Aries, supra*, 48 Cal.App.3d at p. 541.)

Pursuant to court questioning at oral argument, however, Western maintained that Calvert has forfeited any claim of substantial property deprivation by settling a prior federal lawsuit against Western (for $10,000, along with other plaintiffs, we note) and by dismissing with prejudice his original third cause of action here against Western for nuisance. In the settlement agreement in the federal suit, Calvert reserved "the right to bring and prosecute a lawsuit in state court alleging violations of . . . (SMARA)" by the County, the State and Western, and also reserved the right to "bring a nuisance claim against Western predicated on alleged noise and vibration from Western's operations," but the nuisance claim could not include "any claim for alleged water or air pollution by Western, which claims [were] . . . explicitly waived and released . . . ." Of course, Calvert has brought the present state court action, which includes the SMARA causes of action, and which also included, originally, a nuisance cause of action against Western that was based essentially on allegations of dust and air pollution. Calvert has since dismissed with prejudice this nuisance cause of action against Western.

We conclude that the settlement of the federal lawsuit against Western for $10,000 and the dismissal of the nuisance cause of action against Western do not mean that Calvert has forfeited or waived his constitutional right to receive notice and an opportunity to be heard from the governmental entity that will determine Western's vested rights claim. The record cited by Western at oral argument does not disclose the substance of the federal lawsuit—Western's counsel at oral argument referred to it as the "Proposition 65" suit (Proposition 65 covers pollution discharges and warnings)—but Calvert, along with other plaintiffs, settled that suit for $10,000. Even assuming that Calvert has settled and dismissed any property deprivation

claims he has against Western, that only means that Calvert is foreclosed from making any further such claims against Western. Calvert's fifth cause of action here for notice and hearing regarding Western's vested rights determination—under SMARA—is *not* a claim *against Western* for property deprivation. Rather, it is a claim *against the County* for violating procedural due process requirements of notice and hearing in determining that Western has vested rights to mine the 3,430 acres. And Calvert is not maintaining this procedural due process claim against the County *for* his property deprivation, but *because* of such deprivation. Recall that due process "notice and hearing requirements are triggered only *by governmental action* which results [or will result] in 'significant' or 'substantial' deprivations of property." (*Horn, supra,* 24 Cal.3d at p. 616, italics added.)

In other words, while Calvert may be foreclosed from seeking any further remedy against Western for property deprivation, he is still entitled to due process notice from, and an opportunity to be heard before, the governmental entity deciding Western's vested rights claim because he has "suffered [a] significant deprivation of property" related to that claim. (See *Horn, supra,* 24 Cal.3d at p. 615 [rejecting argument that landowner "suffered no significant deprivation of property which would invoke constitutional rights to notice and hearing"].)

Moreover, as we have explained, Western's vested rights determination centers on factual issues involving Western's mining operations and intent. And for over 30 years, Calvert has lived and ranched in the area that is the subject of that determination. Why should Calvert be foreclosed from having his say before the governmental entity deciding these factual issues and making that determination simply because he has settled his property deprivation claims against Western?

■ A waiver of a constitutional right requires a knowing and intentional relinquishment of that right, and such a waiver is disfavored in the law. (See *City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107–108 [48 Cal.Rptr. 865, 410 P.2d 369]; see also *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]; 7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 104, p. 208.) It cannot seriously be argued that Calvert knowingly and intentionally relinquished his constitutional right to notice and hearing from the governmental entity deciding Western's vested rights claim simply because he settled a federal lawsuit against Western (for $10,000, along with others) and dismissed a nuisance cause of action against Western, where neither action involved this constitutional notice and hearing right.

■ Nor can there be any dispute that Calvert has standing to maintain the fifth cause of action. The question of property deprivation sufficient to obtain

due process-based notice and hearing regarding adjudicatory land use decisions must be distinguished from the question of standing to bring the fifth cause of action. Although Western has thrown every threshold procedural roadblock it can think of at Petitioners, it has not claimed that they lack standing to bring the fifth cause of action. Nor could it. A party lacks standing if it lacks "a real interest in the ultimate adjudication because [it] has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented." (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 23 [61 Cal.Rptr. 618]; see 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 73, pp. 132–133.) That certainly cannot be said here. As attested to by the $10,000 settlement in the federal lawsuit and by the scores of pages devoted to appellate briefing on the fifth cause of action, Calvert has suffered and stands to suffer an injury of sufficient magnitude through the governmental determination of Western's vested rights claim to assure that all of the relevant facts and issues have been adequately presented.

We conclude that the governmental determination of Western's vested rights claim implicates property deprivations significant or substantial enough to trigger procedural due process protections for landowners, including Calvert, adjacent to Western's proposed vested rights mining operation.

Western raises several other counterpoints to the conclusion we have reached regarding the necessity for public notice and hearing as to Western's vested rights claim, aside from its argument that a vested rights determination is a ministerial one. We are unpersuaded.

Western first raises a trio of statutory points. As Western correctly observes, SMARA does not specify a procedure for making a vested rights determination. But given the factual issues raised by SMARA's vested rights statute (§ 2776) and by the diminishing asset doctrine, and given that Western has the burden of proving its vested rights claim (*Hansen, supra*, 12 Cal.4th at p. 564), the existence, nature and scope of such rights must be determined pursuant to some procedure even if SMARA fails to specify one. It goes without saying that that procedure must be a constitutional one.

Along similar statutory lines, Western also notes that SMARA, unlike the California Coastal Act of 1976 (§ 30000 et seq.) or the federal Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. § 1201 et seq.), does not contain a procedure for a public hearing to determine vested rights. As Western acknowledges in its briefing, though, these non-SMARA statutes do not contain this procedure, but regulations enacted pursuant to them do. (§ 30000 et seq.; Cal. Code Regs., tit. 14, §§ 13200–13205, 13059; 30 U.S.C. § 1201 et seq.; 30 C.F.R. §§ 761.11, 761.16 (2006).) Furthermore, the state

coastal act provision on vested rights has been characterized as "remarkably similar" to the SMARA provision on vested rights, section 2776. (See § 30608, former § 27404 [as characterized in 59 Ops.Cal.Atty.Gen., *supra*, at p. 647].)

And for the third point in Western's statutory trilogy, SMARA, in section 2774 states that every lead agency shall adopt ordinances establishing procedures that require at least one public hearing for the review and approval of reclamation plans and financial assurances and the issuance of surface mining permits. (§ 2774, subd. (a).) Although section 2774 does not mention vested rights determinations, the section recognizes that public hearings are required to address the complex, judgment-based issues raised by permits, reclamation plans and financial assurances. We have seen that vested rights determinations in the diminishing asset context raise analogous complexities and judgment calls. Western, however, sees a distinction: determinations of mining permits and reclamation plans look to the future and involve what should happen, while determinations of vested rights look to the past and involve what has happened. Actually, it can be said that vested rights determinations, particularly in the diminishing asset context, look to the past to look to the future. But semantics aside, Western's observation is of little help in deciding what procedural due process requires. For that, we must look, not so much to the past or to the future, but to what is being decided and to the consequences of that decision.

Finally, Western is concerned that if a public adjudicatory hearing is required to confirm vested rights, public hearings will have to be held statewide for all operations based on vested rights. As we have emphasized, though, our decision applies only to an entity claiming a vested right under SMARA to conduct a surface mining operation that is subject to the diminishing asset doctrine.

■ This concern does raise, however, the issue of whether our decision should be given prospective or retroactive effect. Generally, judicial decisions are applied retroactively. But considerations of fairness and public policy may limit such application. (*Woods v. Young* (1991) 53 Cal.3d 315, 330 [279 Cal.Rptr. 613, 807 P.2d 455]; see *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 193 [98 Cal.Rptr. 837, 491 P.2d 421]; see also 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 984, p. 1038.) We prefer to steer a middle course of limited retroactivity here, making our decision apply to all cases, including the one before us, in which no final judgment on appeal has yet been rendered, or in which an administrative determination of SMARA-based vested rights, in the context presented here of diminishing asset surface mining, is yet to be made or has been made and is still subject to administrative or judicial review. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, § 986, pp. 1042–1043, & cases cited therein.) Our concern is that property rights may have been founded and deemed vested in accordance

with a less formal vested rights determination under SMARA, which does not specify a procedure for this determination. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, § 949, p. 992 [perhaps the strongest of the considerations that influence courts to follow an established rule is that property rights have been founded and have become vested in accordance with the rule].)

 We conclude the trial court properly granted Petitioners summary adjudication on their fifth cause of action against Western. County's determination that Western had vested rights under SMARA to mine aggregate on the 3,430 acres violated procedural due process requirements of reasonable notice and an opportunity to be heard.

Now we turn to Petitioners' cross-appeal. As to the fifth cause of action, Petitioners properly obtained a writ of mandate to remand for constitutionally proper proceedings. (*Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 953 [77 Cal.Rptr.2d 231] [ordinary mandate appropriate to compel agency to hold legally required hearing].) The trial court's modified judgment, as noted, imposed three remand-related conditions: County was not required to hold a new vested rights proceeding; Western was not required to request one; and if County held such a proceeding, it had to meet procedural due process requirements. In their cross-appeal, Petitioners contend these conditions have effectively foreclosed any remedy for the constitutional violation the trial court found pursuant to the fifth cause of action. We agree and resolve the cross-appeal as follows.

If Western wants to continue its aggregate mining in the Yuba Goldfields, it will either have to prove its claim of vested rights in a public adjudicatory hearing before the Board (§ 2776), or obtain a permit to conduct such surface mining in a public adjudicatory hearing before the County (§§ 2770, subd. (a), 2774, subd. (a), 2774.4, subd. (a); *Hayssen, supra*, 171 Cal.App.3d at p. 404). This is because the Board has taken over the County's SMARA duties regarding Western. (§ 2774.4.) Under section 2774.4, when the Board takes over for a lead agency, it "shall exercise" any of the SMARA powers of that lead agency "except for permitting authority." (§ 2774.4, subd. (a).)[2]

---

[2] We have specified a deadline for this choice—vested rights or permit—in the Disposition part of this opinion. Apparently, Western has continued mining during the pendency of these proceedings and has not been, to this point, legally precluded from doing so. Until the vested rights or permit decision is made, Western may continue with its current mining, if any, in similar fashion but not expand or intensify that mining. (See *Bauer v. City of San Diego* (1999) 75 Cal.App.4th 1281, 1296 [89 Cal.Rptr.2d 795] [city could not properly deem plaintiff's vested property rights based on an existing legal nonconforming use automatically terminated without providing plaintiff an opportunity to be heard]; see also *Hansen, supra*, 12 Cal.4th at p. 552 [describing legal requirements for a continuance of a nonconforming use].) Western remains subject to all applicable SMARA provisions regarding reclamation plans and financial assurances as to any such ongoing mining. (§ 2770.)

Furthermore, the Board will conduct any public adjudicatory hearing to determine Western's vested rights claim at an appropriate site within the County. (See, e.g., § 2774.4, subd. (c) [the Board shall hold a public hearing as to a lead agency's section 2774.4 deficiencies "within the lead agency's area of jurisdiction"].) Western remains subject to all applicable SMARA provisions regarding reclamation plans and financial assurances as to any authorized mining. (§ 2770.)

Notice of any public adjudicatory hearing regarding vested rights must be reasonably calculated to afford affected persons the realistic opportunity to protect their interests. Such notice must occur sufficiently prior to the determination of vested rights to provide a meaningful predeprivation hearing to affected landowners. (*Horn, supra,* 24 Cal.3d at pp. 617–618; see § 2774 [concerning public hearing regarding permit].) As suggested in *Horn,* an acceptable notice technique might include the mailing of notice to property owners of record within a reasonable distance of the subject property and the posting of notice at or near the project site. (*Horn, supra,* 24 Cal.3d at p. 618.)[3]

### 2. *First Cause of Action—Mandate to Compel SMARA Enforcement*

In their first cause of action, Petitioners essentially seek a writ of mandate to compel the County and the State to enforce SMARA against Western for having no permit and no valid reclamation plan. We conclude the trial court properly granted summary adjudication to Western on this cause of action.

■ Under SMARA, "[a]ny person may commence an action on his or her own behalf against the [B]oard, the State Geologist, or the director [of the Department of Conservation] for [a traditional] writ of mandate . . . to compel the [B]oard, the State Geologist, or the director to carry out any duty imposed upon them pursuant to [SMARA]." (§ 2716.) For Petitioners to obtain a traditional writ of mandate, they must show: (1) a clear, present and usually ministerial duty on the part of the State or the County; and (2) a clear, present, and beneficial right on the Petitioners' part to the performance of that duty. (*Mobley v. Los Angeles Unified School Dist.* (2001) 90 Cal.App.4th 1221, 1244 [109 Cal.Rptr.2d 591] (*Mobley*); Code Civ. Proc., §§ 1085–1086; see 8 Witkin, Cal. Procedure, *supra,* Extraordinary Writs, § 72, p. 853, & cases cited therein.)

As noted, at the heart of SMARA is the requirement that every surface mining operation have a permit (or a vested right to mine), a reclamation plan, and financial assurances for reclamation. (§ 2770, subd. (a); *El Dorado,*

---

[3] In light of our resolution of the fifth cause of action, we will not consider the parties' evidence and arguments regarding the existence, nature and scope of Western's alleged vested rights to mine aggregate in the 3,430-acre area. That will be the subject of the public adjudicatory hearing on vested rights, if that procedure is chosen.

*supra*, 36 Cal.4th at p. 984.) From this, Petitioners argue that SMARA does not allow surface mining without a permit and an approved reclamation plan based on it, except where vested rights have been established, and that is not the case here. Petitioners assert that, with no established vested rights, Western's mining without a permit or a reclamation plan based on it simply cannot be ignored or excused. Having vacated County's vested rights determination, the trial court should immediately have issued a writ of mandate compelling the County and the State to enforce SMARA, Petitioners maintain.

Leaving aside any issues of how the principle of agency prosecutorial discretion may apply here (see, e.g., *Heckler v. Chaney* (1985) 470 U.S. 821, 831–832 [84 L.Ed.2d 714, 105 S.Ct. 1649]; see also § 2774.1, subd. (a)), Petitioners cannot show that they meet the two basic requirements for issuance of a writ of mandate.[4]

Western did establish its vested rights in a proceeding before the County. Furthermore, it is undisputed that Western has a reclamation plan that was approved in 1980. As the new lead agency, the State accepted the County's vested rights determination and is relying on that determination as well as on Western's 1980 reclamation plan to process an amendment to the plan.

As we and the trial court have concluded, County's procedure for determining Western's vested rights violated procedural due process, and a new proceeding will have to be held pursuant to reasonable notice and an opportunity to be heard. Thus, it has not been determined substantively that Western lacks vested rights, only that the procedure for determining vested rights was legally flawed. And Western does have an approved reclamation plan, although it is being updated.

In this muddled context, then, there is no clear, present and ministerial duty on the State's part to enforce SMARA against Western for having no mining permit and corresponding reclamation plan. Consequently, there is no clear, present and beneficial right on the Petitioners' part to such enforcement. Accordingly, Petitioners are not entitled to the writ of mandate they seek in the first cause of action, and summary adjudication in favor of Western was properly granted on this action.

### 3. *Second and Third Causes of Action—Direct Actions Against Western for SMARA Violations*

In their second and third causes of action, Petitioners allege direct actions against Western for violating SMARA by, respectively, not having a permit or

---

[4] We deny the State's request to take judicial notice regarding the prosecutorial discretion of the State Water Resources Control Board.

vested rights and not having a reclamation plan. Petitioners seek injunctive relief in these causes of action.

After reviewing these matters, we conclude the trial court properly resolved them. We adopt the trial court's summary adjudication opinion on these causes of action as our own. With appropriate deletions and additions, that opinion reads as follows:[5]

SMARA does not contain an explicit provision authorizing private enforcement through an action for an injunction against a mining operator. Instead, SMARA sets forth detailed provisions for administrative enforcement by the lead agency or the Director of the Department of Conservation. (See, [[e.g.,]] [] [[§ ]] 2774.1.) The only provision of SMARA that explicitly permits an action by a member of the public at large is [] section 2716, which permits "any person" to commence an action for a writ of mandate against certain state agencies or officers to compel them to carry out any duty imposed upon them pursuant to SMARA. This provision does not authorize a direct action against a mining operator.

■ . Petitioners rely on [] section 2774.1[[, subdivision ]](g), which states that "[r]emedies under this section are in addition to, and do not supersede or limit, any and all other remedies, civil or criminal." [[We are]] not persuaded that [[this provision]] authorizes private enforcement of SMARA. In *Moradi-Shalal v. Fireman's Fund Ins*[[.]] *Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] [[*Moradi-Shalal*]], the Supreme Court held that a similar provision in a comprehensive statutory scheme for administrative enforcement of unfair practices claims in the insurance business did not establish a private right of action against insurance companies that committed such practices. Here, as in *Moradi-Shalal*, the Legislature created a comprehensive administrative scheme to enforce SMARA, indicating that private enforcement was not contemplated, at least not in the form attempted here.

The fact that SMARA does not authorize enforcement actions by private parties does not mean that private parties affected by mining in violation of SMARA have no remedy. As the Supreme Court explained in *Moradi-Shalal*, apart from administrative remedies, the courts retain jurisdiction to impose civil damages or other remedies in appropriate common law actions based on

---

[5] Single brackets without enclosed material indicate our deletions while double brackets with enclosed material indicate our additions to the opinion. (See, e.g., *People v. Coria* (1999) 21 Cal.4th 868, 871, fn. 1 [89 Cal.Rptr.2d 650, 985 P.2d 970].)

traditional theories, i.e., based on law other than the administrative enforcement scheme itself. (46 Cal.3d at [[pp.]] 304–305.) In fact, SMARA explicitly recognizes and preserves the right of private parties to seek relief against mine operators under other law. (See [] [[§ ]] 2715[[, subd. ]](d).) As set forth therein, such relief might be sought in an action [[for]] private nuisance [[or for other appropriate private relief]]. [] The present action as it stands, however, is based purely on the alleged violations of SMARA. Petitioners' separate nuisance claim has been dismissed, and the Complaint/Petition does not purport to state a cause of action for [] any other claim arising outside of SMARA. []

[] Petitioners' [[second and third]] cause[[s]] of action [] therefore [[are]] not authorized by SMARA and the motion for summary adjudication [[regarding them was properly]] granted.

[End of quotation from the trial court's opinion.]

4. *Fourth Cause of Action—SMARA Enforcement and State as Lead Agency*

In their fourth cause of action, Petitioners seek a writ of mandate, claiming the State has abused its discretion by not enforcing SMARA and by not taking over the lead agency functions from the County.

 Summary adjudication was properly granted in Western's favor on this cause of action. We have already rejected the writ of mandate claim involving State SMARA enforcement in part 2. of the Discussion concerning the first cause of action. And the Board in this matter has already taken over the lead agency SMARA functions from the County. As the trial court noted, a writ of mandate will not issue to compel an action that already has been performed. (See *Mobley, supra*, 90 Cal.App.4th at p. 1244.)

### DISPOSITION

The judgment is modified as follows. The three conditions on remand specified in the judgment are vacated and the following conditions are imposed: If Western wants to continue its aggregate mining in the Yuba Goldfields, it will either have to prove its claim of vested rights in a public adjudicatory hearing before the Board (to be conducted within the County's area of jurisdiction), or obtain a permit to conduct such surface mining based

on a public adjudicatory hearing before the County. Western will have 30 days from the issuance of this Court's remittitur to inform the Board and the County of its choice. Depending on that choice, the Board or the County will then proceed immediately to provide adjacent landowners reasonable notice and an opportunity to be heard. Western remains subject to all applicable SMARA provisions regarding reclamation plans and financial assurances.

As modified, the judgment is affirmed. Each party shall pay its own costs on appeal.

Blease, Acting P. J., and Hull, J., concurred.

On January 3, 2007, the opinion was modified to read as printed above.